UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERENCE J. HAYES,

    Plaintiff,

v.

CAROLYN W. COLVIN,

    Defendant.

Civil Case No.
1:14-cv-1441 (RJL)

**FILED**
SEP 0 9 2015
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

MEMORANDUM OPINION
(September ___, 2015) [Dkts. #11, #13]

Plaintiff Terence J. Hayes ("plaintiff") brings this action against defendant Carolyn W. Colvin, Commissioner of the Social Security Administration ("defendant" or "Commissioner") pursuant to 42 U.S.C. § 405(g), seeking reversal of the Commissioner's denial of his application for Social Security Disability Insurance and Supplemental Security Income benefits. *See* Compl. [Dkt. #1]. Now before the Court are plaintiff's Motion for Judgment of Reversal [Dkt. #11] and defendant's Motion for Judgment of Affirmance [Dkt. #13]. For the reasons set forth below, the Court DENIES plaintiff's Motion, GRANTS defendant's Motion, and DISMISSES this case.

## BACKGROUND

### I. Legal Framework and Procedural History

Plaintiff applied to the Social Security Administration ("SSA") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on January 7,

1

2011 and May 18, 2011, respectively, alleging numerous maladies. *See* Administrative Record ("AR") at 134-41 [Dkt. #8]. To qualify for SSI and DIB, a claimant must demonstrate that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Plaintiff contends that he meets this statutory definition. His multi-year quest for disability benefits, however, has proven unsuccessful. *See* AR at 89-102. After the Commissioner denied his initial petitions, plaintiff requested, and received, review by an Administrative Law Judge ("ALJ"). *See* AR at 42-88. This too, failed. AR at 19-36. The ALJ's decision became the final decision of the Commissioner on May 29, 2014, AR at 5, and, shortly thereafter, plaintiff sought judicial review from this Court, *see* Complaint.

## II. Administrative Record

The ALJ's decision was based on the following administrative record.[1] On October 17, 2011, approximately three years after the purported onset of his disability, plaintiff saw District of Columbia Adult Protective Services therapist Sophia Lenk, CP, M.S.W., who evaluated plaintiff for hoarding tendencies and obsessive thoughts. AR at 229. At his initial visit, plaintiff displayed a "preoccupation with getting SSDI

---

[1] Plaintiff's alleged disability onset date is October 31, 2008. However, because plaintiff did not seek treatment until 2011, the administrative record reflects only those medical records generated beginning in 2011.

approved," leading Lenk to conclude that plaintiff was "[m]alingering" and "manipulat[ing] community resources to his advantage." AR at 229. According to Lenk, plaintiff's behavior, affect, and memory were otherwise within "normal limits." AR at 230. During an October 31, 2011 appointment with Lenk, plaintiff was once again fixated on obtaining disability benefits for mental illness despite his belief that he had no such affliction. AR at 225. During his final session with Lenk on November 7, 2011, plaintiff continued to "obsess[] over being approved for SSA" but was otherwise "pleasant" and "future-focused." AR at 223. Lenk diagnosed plaintiff with "malingering" and OCD, but opined that further crisis therapy was unnecessary. AR at 223.

On April 11, 2012, plaintiff sought treatment from psychiatrist Arda Kasaci, M.D. for "anxiety, homelessness and assistance with his disability." AR at 268. Plaintiff, who admitted to being "obsessed" with obtaining disability benefits, informed Dr. Kasaci that he had moved to Washington D.C. to "try his disability" claims. AR at 268. Plaintiff denied feelings of hopelessness or suicidal ideation, leading Dr. Kasaci to conclude that plaintiff exhibited "logical" thought content, as well as "intact" memory and judgment. AR at 268. Nonetheless, based on plaintiff's anxious mood and circumstantial thought process, Dr. Kasaci diagnosed plaintiff with OCD and anxiety disorder, and assessed him with a Global Assessment of Functioning ("GAF") score of

45.[2]  AR at 268-69.  During a July 5, 2012 follow-up visit with Dr. Kasaci, plaintiff continued to have "obsessive thoughts about SSI," but reported "fewer anger episodes" and felt neither hopeless nor suicidal.  AR at 255.  On September 6, 2012, Dr. Kasaci increased plaintiff's anti-depressant dosage and reassessed plaintiff's GAF at 50.  AR at 253.

On October 31, 2012, Dr. Kasaci completed a medical source statement for plaintiff, noting that he had a "limited but satisfactory" ability to execute short and simple instructions, but "seriously limited" abilities to understand and remember simple instructions, to maintain attention for two-hour segments, to work with others, and to make simple work-related decisions.  AR at 277-78.  In light of these difficulties, Dr. Kasaci opined that plaintiff was "unable to meet competitive standards" in several functional areas, including remembering work procedures, sustaining an ordinary routine, and maintaining socially appropriate behavior.  AR at 277-78.

Between September 2012 and January 2013, plaintiff sought psychiatric treatment from Dr. Kathryn Walseman, M.D.  On September 24, 2012, Dr. Walseman diagnosed plaintiff with anxiety disorder, but nonetheless assessed his GAF score at 65 in light of his "organized" thought processes and "fair" judgment.[3]  See AR at 348-49.  Dr.

---

[2] A GAF score represents a clinician's judgment about a patient's functional level.  A GAF score of 41-50 indicates serious cognitive or social impairments.  Def.'s Mot. at 13 n.1 (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders – Text Revision* (DSM-IV-TR) 32, 34 (4th ed. 2000)).

[3] A GAF score of 65 indicates mild symptoms or limited difficulty in social or occupational functioning.  Def.'s Mot. at 13 n.1 (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical*

Walseman saw plaintiff four additional times in November and October 2012, but did not find any changes in plaintiff's mental state or GAF score.[4] *See* AR at 340, 342, 344-45, 346. On January 14, 2013, Dr. Walseman completed a medical statement, opining that plaintiff was "seriously limited but not precluded" from remembering work procedures, executing short instructions, maintaining attention for two-hour segments, sustaining an ordinary routine without special supervision, and making simple work-related decisions. AR at 375-76. She further stated that plaintiff was "unable to meet competitive standards" in several functional areas, including working at a consistent pace and responding appropriately to criticism from supervisors. AR at 375-76.

In addition to his psychiatric issues, plaintiff complained of hip, knee, and spinal problems. On November 21, 2011, an x-ray of plaintiff's left hip revealed no evidence of fracture, dislocation, or "significant" degenerative changes. AR at 232. Shortly thereafter, on November 26, 2011, plaintiff visited Dr. Glen Monteiro, M.D., for a physical examination. *See* AR at 234-38. Based on his examination, Dr. Monteiro concluded that plaintiff had a limited range of motion in his spine, shoulders, and hips,

---

*Manual of Mental Disorders – Text Revision* (DSM-IV-TR) 32, 34 (4th ed. 2000)).
[4] Indeed, during his October 15, 2012 appointment, plaintiff's mood was "about the same," and although his "affect was slightly restricted," plaintiff appeared "cooperative," with "regular" speech, and "intact" cognition. AR at 344. During his November 12, 2012 follow-up appointment, plaintiff informed Dr. Walseman that he was "feeling a bit better." AR at 340. Dr. Walseman assessed his mood as "overall better," found no "overt paranoia or delusions," and opined that his cognition was "intact" and his insight and judgment were "fair." AR at 340.

*see* AR at 239, but characterized plaintiff's condition as "unimpressive overall," AR at 237. Dr. Monteiro further opined that although plaintiff exhibited "some limitations with stooping, crouching, [and] bending," plaintiff could stand and walk for up to six hours a day, sit for up to six hours a day, and could "occasionally" lift and carry up to 10 pounds and "frequently" lift and carry less than 3 pounds. AR at 238. State agency physician Dr. Michael Hartman, M.D., concurred with this assessment and found, upon completing a physical residual functional capacity assessment, that plaintiff could "occasionally" lift or carry 20 pounds, "frequently" lift or carry 10 pounds, and could stand, walk, or sit for six hours of an eight-hour workday. AR at 94.

Plaintiff also saw Dr. Robert Ball, M.D. for his back and hip problems. Based on his initial visit with plaintiff in March 2012, Dr. Ball diagnosed plaintiff with "low back syndrome" and COPD, but otherwise found plaintiff's physical exam to be within normal limits. *See* AR at 274. When Dr. Ball next examined plaintiff on May 2, 2012, he once again found plaintiff's condition unremarkable. *See* AR at 265. In his subsequent May 31, 2012 report, Dr. Ball opined plaintiff had only "moderate" restrictions on his social skills, concentration, and daily activities, and was capable of sitting for about 6 hours of a typical work day. AR at 248. Notwithstanding these "moderate" limitations, Dr. Ball concluded, in the same report, that plaintiff's medical condition would prevent him from working for the next calendar year. AR at 248.

### III. ALJ's Disability Determination

The ALJ here applied a five-step sequential evaluation to determine whether, based on the administrative record, plaintiff was entitled to SSI and DIB. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Under this evaluation, a claimant must first show that he is not presently engaged in substantial gainful activity ("step one"). *Id.* at §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If he is not, the ALJ must determine whether the claimant has a "severe" impairment or combination of impairments that limit his ability to perform basic work for at least 12 consecutive months ("step two"). *See id.* at §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairment is severe, the ALJ must determine whether it (a) "meets" or (b) "functionally equals" one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("step three"). *Id.* at §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment does not meet that threshold, the claimant must demonstrate that he is nonetheless unable to perform his prior work ("step four"). *Id.* at §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the ALJ is satisfied that the claimant is incapable of returning to his prior work, the ALJ must determine whether, based on the claimant's "residual functional capacity," he can "make an adjustment to other work" in the national economy ("step five"). *Id.* at §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

Applying this framework, the ALJ found that plaintiff satisfied the first two steps of the evaluation. AR at 21-22. Although the ALJ found that plaintiff was severely

impaired, he nonetheless found at the third step of the inquiry that plaintiff's condition did not meet or equal any of the enumerated impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR at 22-24. Before reaching steps four and five, the ALJ determined that, beginning on November 7, 2011, plaintiff retained the residual functional capacity to:

> "perform light work . . . except [that] he should do no climbing of ladders/ropes/scaffolds; can perform stooping on an occasional basis; limited to work requiring remembering and carrying out simple instructions (no complex tasks) with occasional contact with co-workers, supervisors[,] and the public; and due to concentration/focus problems, the claimant may be off-task 5% of the work day."

AR at 27. Based on this assessment, the ALJ concluded at step four that plaintiff was capable of performing his prior work until November 7, 2011, when he first sought treatment for his impairments. AR at 33-34. Nonetheless, the ALJ found at step five that after November 7, 2011, although plaintiff could not perform his prior work, he could still perform other work in the national economy. AR at 34-36.

## LEGAL STANDARD

In a disability proceeding, the ALJ "has the power and the duty to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination of disability." *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of HEW*, 627 F.2d 278, 281 (D.C. Cir. 1980)). The ALJ's ultimate determination is "conclusive" if it correctly applies the governing legal

standards and is based on substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support [a] conclusion," *Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987), and demands, as a practical matter, evidence of more than a scintilla, but "less than a preponderance," *Affum v. United States*, 566 F.3d 1150, 1163 (D.C. Cir. 2009) (citation and internal quotation marks omitted). The District Court's task on appeal is thus to examine the record under the prism of deference, and to determine, based on the record as a whole, whether the ALJ articulated a supportable basis for his conclusion. *See Simms*, 877 F.2d at 1050.

## DISCUSSION

Plaintiff here makes several challenges to the ALJ's decision. He first claims that in determining plaintiff's residual functional capacity to perform his prior work, the ALJ improperly weighed the opinions of his treating physicians and discounted his allegations of pain. Plaintiff next claims that because of these errors, the ALJ's reliance on the vocational expert to determine that he could perform work in the national economy was misplaced. For the reasons discussed below, I find plaintiff's contentions unavailing and uphold the ALJ's determination.

### I. ALJ's Residual Functional Capacity Analysis

Plaintiff first argues that the ALJ erroneously determined he has the residual functional capacity ("RFC") to perform "light work." Pl.'s Mem. of Law in Supp. Mot.

Case 1:14-cv-01441-RJL Document 16 Filed 09/09/15 Page 10 of 17

J. Reversal ("Pl.'s Mem.") at 12-22 [Dkt. #11-1]. I disagree. Before making a determination as to whether a claimant can return to past work, or engage in alternative employment, the ALJ must perform an RFC analysis. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); SSR 96–8p, *Pol'y Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s) . . . may affect his or her capacity to do work-related physical and mental activities." SSR 96–8p, 1996 WL 374184, at *2. RFC is based on numerous factors, including an individual's medical records, testimony, and subjective assertions of pain. In rendering his determination, the ALJ has the exclusive duty to evaluate, and weigh, the totality of the evidence. *See* 20 C.F.R. §§ 404.1527, 416.927. Despite this latitude, it is incumbent on the ALJ to explain "how he considered and resolved any material inconsistencies or ambiguities evident in the record" and to articulate the reasons for rejecting any evidence "in conflict with the ultimate RFC determination." *Butler v. Barnhart*, 353 F.3d 992, 1000 (D.C. Cir. 2004) (quoting SSR 96–8p, 1996 WL 374184, at *7).

### A. Weight of Medical Opinions

Plaintiff first argues that in assessing his RFC, the ALJ improperly weighed the medical opinions of Doctors Kasaci, Walseman, and Ball. Pl.'s Mem. at 12-20. Not so. Although ALJs generally accord substantial weight to the opinions of treating

10

physicians, they need not accept medical opinions that are either internally inconsistent or contradicted by substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993) ("The treating physician's opinion regarding an impairment is usually binding on the fact-finder unless contradicted by substantial evidence." (citation and internal quotation marks omitted)). The ALJ here determined that the opinions of Doctors Kasaci, Walseman, and Ball had less probative value than the opinions of Ms. Lenk and Dr. Montiero, whose findings he deemed supportable. *See* AR at 28, 31-33. After careful review of the record, I find nothing untoward about these assessments.

There are, as the ALJ pointed out, substantial inconsistencies between Doctors Kasaci and Walseman's medical observations and their respective conclusions about plaintiff's functional abilities. Dr. Kasaci noted, for example, that plaintiff exhibited "logical" thought content and "intact" judgment. AR at 268. Never, over the course of plaintiff's treatment, did Dr. Kasaci find evidence of suicidal ideation or hopelessness. *See* AR at 253, 255, 263, 268. In fact, according to Dr. Kasaci, plaintiff exhibited "no gross psychotic features" whatsoever. AR at 257. To the contrary, plaintiff's mental state stabilized over the course of treatment, prompting Dr. Kasaci to increase his GAF score from 45 to 50. *Compare* AR at 268, *with* AR at 253. As such, Dr. Kasaci's conclusion in October 2012 that plaintiff was unable to meet numerous competitive standards, is perplexing, to say nothing of contradictory. *See* AR at 277-78.

Dr. Walseman's opinion is plagued by the same inconsistencies. Dr. Walseman noted during her examinations that plaintiff had an "okay" mood with only "slightly restricted" affect, no overt psychosis or suicidal ideation, and exhibited "fair" insight and judgment. *See* AR at 340, 342, 344, 346, 348. She routinely categorized plaintiff's depression as either "mild" or in "remission," and consistently assessed plaintiff's GAF score at 65. *See* AR at 340, 345, 346, 349. Contrary to her opinion in January 2013 that plaintiff was unable to meet competitive standards in several key areas, Dr. Walseman's observations evidence mild, not debilitating, cognitive limitations. *See* AR at 374-76.

For the same reasons, the ALJ properly accorded Dr. Ball's opinion less weight than Dr. Monteiro's opinion. *See* AR at 31-32. Indeed, Dr. Ball's May 2012 report that plaintiff's impairments left him unable to work is belied by his clinical findings. His medical notes from May 2012 indicate that plaintiff had normal reflexes, peripheral pulses, and muscle strength. *See* AR at 261, 265. The doctor opined, moreover, that plaintiff had only "moderate" restrictions on his ability to perform daily activities. AR at 248. Dr. Ball's subsequent conclusion that plaintiff would be unable to work for the next year is simply not supported by his observations. *See* AR at 248. In fact, Dr. Ball's findings are more consistent with Dr. Monteiro's opinion that plaintiff had few physical limitations, and, in any event, nothing that prohibited light exertion. *See* AR at 238.

In light of this record, I see no reason to disturb the ALJ's determination that the opinions of Doctors Kasaci, Walseman, and Ball were unduly influenced by plaintiff's subjective allegations of pain. In rendering his opinion, the ALJ acknowledged all of the medical opinions in the record and adequately explained his reasoning. Simply put, the ALJ did, as factfinder, precisely what he was supposed to do, and, because his findings are buoyed by substantial evidence, the Court must, and will, defer to his assessments.

### B. Plaintiff's Credibility

Plaintiff's second contention is that the ALJ misjudged his credibility. Pl.'s Mem. at 20-22. Once again, I disagree. Not only was the ALJ entitled to adjudge plaintiff incredible, but he was justified in doing so. The SSA prescribes a two-step process for determining whether an individual has symptoms that affect his ability to perform basic work activities. 20 C.F.R. §§ 404.1529, 416.929. First, the plaintiff must adduce "medical signs or laboratory" findings evidencing "medically determinable impairment(s) that could reasonably be expected to produce" the alleged pain. *Id.* §§ 404.1529(c)(1), 416.929(c)(1). Second, the ALJ must determine whether the applicant's allegations of pain are "consistent with the objective medical evidence." *Id.* §§ 404.1529(a), 416.929(a). Plaintiff disputes only the ALJ's finding under the second prong of this inquiry.

After reviewing the record as a whole, the ALJ determined that "while severe conditions exist, the objective findings simply do not justify the disabling limitations that [plaintiff] alleges in his testimony." AR at 31. The ALJ further concluded that plaintiff's "disability could only be based upon subjective symptoms which the undersigned finds are not fully credible" in light of his "potential malingering" and "untoward motives." AR at 31. This determination is eminently supportable. Plaintiff made numerous overtures for disability benefits. As early as 2011, plaintiff exhibited a "preoccupation with getting approved for SSDI" that led one healthcare provider to conclude that he "manipulates community resources to his advantage." AR at 229. Plaintiff's obsession intensified, and he continued to seek disability benefits on the basis of mental illness, but denied, in the same breath, having any cognitive difficulties whatsoever. *See* AR at 225, 227. This proved to be a common refrain. Plaintiff informed Dr. Kasaci in April 2012 that he was "obsessed" with procuring disability benefits, AR at 268, and later that same year, that he expected to have "a home in DC and a vacation home in Florida once he [received] his SSDI," AR at 298. These are not the machinations of a truly credible man. Thus, I cannot conclude, as plaintiff would have me do, that the ALJ's assessment was erroneous. In fact, based plaintiff's history of malingering, and blatant attempts to "manipulate community resources," I see no reason to disturb the ALJ's credibility determination.

## II. ALJ's Step Four Determination

Plaintiff next argues that the ALJ erroneously determined at step four that he was capable of performing a full range of light work before November 7, 2011. Pl.'s Mem. at 22-23. I disagree. At step four, an ALJ must determine whether a claimant's impairments prevent him from performing his past work. 20 C.F.R. §§ 404.1520 (a)(4)(iv), 416.920(a)(4)(iv). The burden of proof at this stage rests entirely with the plaintiff. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Plaintiff, however, fell far short of his obligation. Although he claims that the ALJ failed to consider whether he was able to meet the mental demands of his previous job, Pl.'s Mem. at 23, the reality is that plaintiff presented no evidence whatsoever of his mental state prior to November 7, 2011. Plaintiff's attempt, moreover, to superimpose evidence of his 2011 psychiatric conditions on a nonexistent record from 2008 is a novel, to say nothing of improper, request. *See* Pl.'s Reply Mem. at 2 [Dkt.#15]. Subsequent medical findings simply cannot be used, as plaintiff would have this Court do, to caulk deficiencies in the administrative record. Accordingly, because plaintiff has not demonstrated that he was unable to meet the demands of his prior job, I defer to the ALJ's finding that he was indeed capable of doing so until November 7, 2011. *See* AR at 33-34.

## III. ALJ's Step Five Determination

Plaintiff's final objection is to the ALJ's conclusion at step five that he retained the functional capacity to perform jobs that exist in the national economy. *See* Pl.'s

Mem. at 23-24. The ALJ's step five determination here was based in large measure on the testimony of a vocational expert. *See* AR at 34-36. ALJs may freely rely on the opinion of a vocational expert that has a full and accurate understanding of the record. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ must not, however, rely on such testimony if the ALJ fails to accurately describe the claimant's physical impairments in any question he poses to the expert. *See Butler*, 353 F.3d at 1005-06; *Simms*, 877 F.2d at 1050.

Plaintiff claims that the vocational expert's testimony here is misleading because it was based on responses to the ALJ's hypothetical questions that omitted the opinions of Drs. Kasaci, Walseman, and Ball. *See* Pl.'s Mem. at 24. In support of his argument, plaintiff relies on case language stating that "hypothetical questions addressed to the vocational expert [should] encompass all relevant impairments of the claimant." *See* Pl.'s Mem. at 24 (quoting *Sloan v. Astrue*, 538 F. Supp. 2d 152, 155 (D.D.C. 2008)). This case law, however, should not be misunderstood. The clear directive is not to present to vocational experts the minutia of every purported malady. Fairly understood, "*relevant* impairments" mean only those impairments that were relevant to the ALJ's RFC assessment—*i.e.*, impairments established by a *credible* body of evidence. *See Lockard v. Apfel*, 175 F. Supp. 2d 28, 33 (D.D.C. 2001) ("[A] hypothetical question to the vocational expert [must] present a faithful summary of the treating physician's diagnosis unless the ALJ provides good reason to disregard that physician's

conclusions."); *see also Pinkney v. Astrue*, 675 F. Supp. 2d 9, 19 (D.D.C. 2009) ("[O]nly the impairments that the ALJ has found to be credible need to be discussed in the hypotheticals."). The vocational expert's testimony here accounted for precisely that. Indeed, both of the hypotheticals that the ALJ posed to the vocational expert tracked his RFC determination. *See* AR at 84-85. Each took into account plaintiff's challenges with interpersonal contact, memory, and cognition, and accounted, moreover, for plaintiff's ability to perform "light" physical labor. *See* AR at 85. That the vocational expert's opinion accounted only for evidence that the ALJ found to be medically supportable is not only proper, it is perfectly reasonable. I therefore conclude that the ALJ's step five determination is supported by substantial evidence.

## CONCLUSION

Thus, for the foregoing reasons, the Court GRANTS defendant's Motion for Judgment of Affirmance, DENIES plaintiff's Motion for Judgment of Reversal, and DISMISSES the case. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge